Fuld, J.
 

 This appeal—as well as those in three other cases also decided today
 
 [1]
 
 — poses a novel question of law touching on an important aspect in the administration of the Unemploy
 
 *5
 
 ment Insurance Law (Labor Law, art. 18) requiring us to determine the meaning of the term “establishment” as used in subdivision 1 of section 592. Insofar as pertinent, that provision recites that “ The accumulation of benefit rights by a claimant shall be suspended during a period of seven consecutive weeks beginning with the day after he lost his employment because of a strike, lockout, or other industrial controversy in the establishment in which he was employed ”.
 

 The employer, National Airlines, Inc., operates an airline for the transportation of passengers, cargo and mail between New York and a number of other cities, many of them in the South. Maintaining its principal office in Miami, it operates branch offices at each station on its route and, in the New York City area, at La Guardia and Idlewild Airports and several places in Manhattan. National also maintains a facility employing mechanics and cleaners at a hangar at the Idlewild Airport. The claimants in this case are the ticket agents, reservation clerks and baggage clerks employed in Manhattan—all of whom are for convenience referred to as “ clerks ’ ’ — and the airplane mechanics and cleaners employed at the Idlewild hangar.
 

 The clerks were represented by one union, the Airline Agents Association, International, the hangar personnel by another and separate labor organization, the International Association of Machinists, AFL-CIO. The industrial controversy, involving only the Airline Agents Association and National, originated as follows. On April 1, 1957, the collective bargaining agreement between National and the Association expired. Negotiations for a renewal of the agreement were carried on over a period of several months but without success. On September 18 and 19, 1958, without the authorization of the union, a number of the clerks employed in the Idlewild office discontinued or failed to report for work. Between September 20 and 22, other members of the Association employed at several of National’s southern offices also stopped work.
 

 During this brief period (from September 18 to September 23), however, National continued to operate its ticket office at Idle-wild with supervisory personnel; its Manhattan ticket offices, as well as the hangar at Idlewild, continued to operate with their regular personnel. • On September 23, however, National discontinued all of its operations and, with certain exceptions
 
 *6
 
 not here relevant, furloughed all of its personnel, including the clerks in the Manhattan offices and the hangar employees at Idlewild.
 

 Thereupon, the Idlewild clerks, the instigators of the walkout, the Manhattan clerks and the hangar employees filed their respective claims for unemployment compensation. The Industrial Commissioner denied benefits to all of the claimants for a seven-week period on the ground that an ‘' industrial controversy ’ ’ existed within the ‘ ‘ establishment ’ ’ of the employer within the meaning of section 592, subdivision 1. The Unemployment Insurance Referee and, thereafter, the Appeal Board overruled the Commissioner with respect to the Manhattan clerks. The Appellate Division modified the board’s decision by granting benefits not only to the Manhattan clerks but to the Idlewild mechanics and cleaners as well.
 

 Before the suspension provision may be invoked under section 592, it must appear, first, that the claimant lost his employment “ because of a strike, lockout, or other industrial controversy ” and, second, that such strike or other industrial controversy occurred “ in the establishment in which he was employed ”. As to the first element, the claimants employed at the Idlewild hangar and those employed at the Manhattan offices seek to establish that their loss of employment did not take place ‘1 because of a strike * * * or other industrial controversy ” involving the Idlewild clerks, but resulted rather from the employee stoppages at National’s southern offices. It may not be disputed that the industrial controversy involved originated with the Idlewild clerks’ refusal to work. Their continued absence from work was clearly a contributing factor in the ultimate layoff of claimants and, for purposes of this decision, it is unnecessary to determine whether the layoff of the claimants resulted solely from that walkout. At least one of the causes underlying the claimants’ loss of employment was the industrial controversy involving the Idlewild clerks.
 

 The first element being established, we turn to a consideration of the second: are the Manhattan offices and the Idlewild hangar facilities within the same ‘ ‘ establishment ’ ’ as the Idlewild office
 
 1
 
 Although both appellants seek to reverse the order of the Appellate Division, each urges different grounds to support his
 
 *7
 
 position. The Industrial Commissioner argues that the phrase
 
 “
 
 containing the word
 
 ‘ establishment
 
 ’ should be given a definition of sufficient breadth to include employees whose continuance at their jobs has become useless, or economically wasteful, while the strike lasts, and ‘
 
 because of
 
 ’ it ’ ’. The employer argues that, since the airline operations are of necessity integrated for the purpose of reserving and selling airplane space and ultimately furnishing transportation, each
 
 “
 
 station ” — that is, each metropolitan area in which the airline has facilities ■—constitutes a single establishment. As opposed to these contentions, the claimants maintain that the term “ establishment ” is to be construed in spatial or geographic terms.
 

 To adopt the broad interpretation advanced by the Commissioner would obliterate the carefully delineated distinction which the statute seeks to draw between the phrase ‘ ‘ in the establishment in which [the claimant] was employed ’ ’ and the phrase ‘1 because of a strike ’ ’. Under his construction, one or the other of the two tests for a suspension of benefits would become superfluous. Manifestly, therefore, the statutory language itself requires rejection of this interpretation.
 

 The employer’s argument that each station constituted a single establishment must also fail. Essentially, it is the contention which was advanced in
 
 Matter of Machcinski (Ford Motor
 
 Co.—
 
 Corsi)
 
 (277 App. Div. 634, 643), and there rejected on the ground that the word “ establishment” as used in the statute means the
 
 “
 
 place where the employee was last employed ”. In this case, too, the Appellate Division, in rejecting the contention and in concluding that the Manhattan offices, the Idlewild office and the Idlewild hangar were separate establishments, reasoned that the Legislature ‘ ‘ did not mean by ‘ establishment ’ the whole compass of a large employer’s business institution where it operates in differently localized components. The word ‘ establishment ’ has strong local connotations ”.
 

 Although the statute furnishes no definitive answer as to whether the term
 
 “
 
 establishment ” is to be given an all-encompassing meaning equated with “ enterprise ” or a more limited spatial meaning equated with
 
 ‘
 
 ‘ place ’ ’ and although the dictionary provides definitions which fit either alternative, we deem it indicated that ‘1 establishment ” is to be equated with
 
 *8
 
 place or situs. The Unemployment Insurance Law is a remedial statute designed to protect the wage earner from, the hazards of unemployment by providing money benefits to individuals “unemployed through no fault of their own ” (Labor Law, § 501). Conversely, only claimants who are unemployed through fault of their own — such as employees who voluntarily quit their jobs or who refuse employment without good cause or who are discharged for misconduct — are denied benefits under the statute (§§ 593, 594).
 

 Subdivision 1 of section 592, constituting the only exception to this statutory tenet, represents this State’s reconciliation of the purposes of unemployment insurance with the principle of governmental neutrality, a principle which runs through all labor relations laws. In the interest of preserving that neutrality between a contesting employer and employees and irrespective of individual need, that provision withdraws benefits under certain limited circumstances there spelled out. The State must stand aside, at least during the early stages of an industrial controversy, and thereby avoid the imputation that a dispute may be financed through unemployment insurance benefits. (See
 
 Matter of Burger
 
 [Corsi], 277 App. Div. 234, 236, affd. 303 N. Y. 654.) The exception, the suspension of benefits otherwise provided for, must be narrowly construed to effectuate the broad humanitarian objectives sought to be achieved by the statute. So read, it is evident that the term ‘ ‘ establishment ” is to be defined in geographic terms rather than in terms of corporate organization or exercise of management powers and functions.
 

 This conclusion is confirmed by reference to the manifest design of the Legislature to provide a rule which may be expeditiously applied. Suspension under section 592 demands proof neither of individual participation in or financial aid to the industrial controversy nor interest in its outcome. Suspension may, perhaps, be invoked even though claimants be separately represented for bargaining purposes. The administrator is thereby spared the need for making either complex or abstract administrative determinations which reference to individual involvement, participation or interest would require. Moreover, the geographic concept of ‘ ‘ establishment ’ ’, looking only to concrete facts, better fits the legislative purpose of
 
 *9
 
 simplicity of administration than does a concept which would require determinations regarding functional 1 ‘ interdependence,” “integration” or “entity”. Finally, apart from the fact that the term ‘ ‘ establishment ’ defined in geographic terms, is more expeditiously interpreted and applied by the Industrial Commissioner, it is more easily understood by both employee and employer, the persons whom it directly involves and affects.
 

 To construe “ establishment” as denoting space or place is also more appropriate to the use of the term in other provisions of the statute. For instance, section 593 (subd. 2, par. [b]) provides that a claimant, who refuses employment because of ‘1 a strike, lockout, or other industrial controversy in the establishment ” in which it is offered, shall be deemed to have refused employment for good cause and shall not be denied benefit rights. The broad definition of establishment sought by the employer in this ease would, if applied to the last-mentioned provision, enable employees to reject appropriate employment and still continue to draw unemployment benefits — a result obviously never intended.
 
 [2]
 

 In addition to the fact, already noted, that the Appellate Division previously decided that the term “establishment” is to be interpreted in the geographic rather than in the functional or managerial sense (see
 
 Matter of Machcinski [Ford Motor Co.
 
 — Corsi], 277 App. Div. 634, 643-644, supra;
 
 Matter of Lasher [Bethlehem Steel Co.
 
 —
 
 Corsi],
 
 279 App. Div. 505, 507), it is of some relevance that the Legislature has resisted a number of attempts, first initiated shortly after the
 
 Machcinslci
 
 decision, to amend the statute so as to extend the scope and content of the term “ establishment ” and the consequent suspension of benefits. (See, e.g., 1953, Assem. Int. No. 1807, Pr. No. 1868; 1957, Assem. Int. No. 3854, Pr. No. 3996; 1959, Assem. Int. No. 3162, Pr. No. 3220; 1960, Assem. Int. No. 2753, Pr..No. 2805; 1961, Sen. Int. No. 2043, Pr. No. 2139.)
 

 Applying the principles set forth above to the facts in the case before us, there can be no doubt that the clerks in the Idle-
 
 *10
 
 wild office and the mechanics in the Idlewild hangar, two and a half miles from the terminal building’s ticket facilities, were not employed in the same establishment. And that, of course, is also true of the Manhattan clerks 10 miles away. The fact that they belonged to the same union as the Idlewild clerks is without significance in view of the geographical connotation to be given the term ‘£ establishment ’ ’. In other words, the industrial controversy involving the clerks at the airline’s terminal building at Idlewild did not occur in the same establishment as that in which either the Idlewild mechanics and cleaners or the Manhattan clerks were employed.
 

 The order of the Appellate Division should be affirmed, without costs.
 

 Chief Judge Desmond and Judges Dye, Burke and Foster concur with Judge Fuld; Judges Froessel and Van Voorhis dissent and vote to reverse and to reinstate the determination of the Industrial Commissioner upon the ground that a restricted interpretation of the word <£ establishment ” as used in subdivision 1 of section 592 of the Labor Law was not intended by the Legislature and would operate to defeat the purpose of the statute.
 

 Order affirmed.
 

 [1]
 

 .
 
 Matter of Curatalo (Catherwood), Matter of Wentworth (Catherwood)
 
 and
 
 Matter of Gílmartin (Catherwood) (infra,
 
 p. 10
 
 et seq.).
 

 [2]
 

 . A glance through the Labor Law discloses that “ establishment
 
 ”
 
 is used in a number of provisions other than those in article 18 (e.g., § 2, subd. 9; § 2, subd. 11; § 376; § 391, subd. 1; § 661) and that in each, instance the term unquestionably connotes “place” or “geographic situs”.